# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ARACELI CADENAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 07750 |
| | ) | |
| BUTTERFIELD HEALTH CARE II, INC., | ) | Judge John J. Tharp, Jr. |
| d/b/a MEADOWBROOK MANOR of | ) | |
| NAPERVILLE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a pregnancy discrimination case brought by Araceli Cadenas, who worked as a Certified Nursing Assistant (CNA) at defendant Meadowbrook Manor's nursing and rehabilitation facility in Naperville. She contends that Meadowbrook unlawfully terminated her employment because of her pregnancy; she also alleged that Meadowbrook improperly withheld her personnel file in violation of Illinois law, but she has since abandoned that claim. The defendant moved for summary judgment, and for the reasons explained herein and on the record at the hearing on July 10, 2014, the motion is denied as to the discrimination claim.

## FACTS

Cadenas began working for Meadowbrook's nursing home facility in Naperville, Illinois as a Certified Nursing Assistant (CNA) in September 2011. The CNA job description states that the position's major tasks include assisting residents with range of motion exercises, placing and removing splints, and assisting with dressing, bathing, eating, and using the bathroom, as well as lifting, moving, and physically transferring residents from their beds to their wheelchairs safely. CNA duties also include turning and re-positioning residents who cannot do this themselves

every two hours and assisting residents with walking and moving around the facility for meals and other activities. Meadowbrook considered Cadenas to be a good worker, and she did not have any instances of employee performance problems.

The CNA job is physically demanding and sometimes required Cadenas to push more than twenty pounds when she was pushing a resident in a wheelchair. Meadowbrook also has a Limited Life Resident Handling Policy that requires CNAs to carry safety or "gait belts" with them at all times to assist with resident lifts, moves and transfers. CNAs place the belts around residents' chests or waists, and use their own weight to pull and lift the resident up. These maneuvers require CNAs to pull, push or lift at least 20 pounds.

Meadowbrook has an unwritten policy of offering light duty work only to employees who have work-related injuries. According to Human Resources Director Joan Soppi, who began working at Meadowbrook in 2001, no employee has received light duty work for a non-work-related injury, including for pregnancy. In her declaration, Soppi provided two examples where she says light duty work was denied for non-work-related injuries. Cadenas testified that two Meadowbrook employees, one of them an unnamed CNA who hurt her arm and the other an employee Cadenas identified as "Irma," did receive light duty. Soppi stated in her declaration that the only Meadowbrook employee with an arm injury was Christina Forget, a CNA who injured her arm while turning a resident at Meadowbrook, and that the only Irma at Meadowbrook was Irma Almanza de Perez, a CNA who did not request or receive light duty for any non-work related injury or for pregnancy.

Employees who have restrictions or a non-work related injury may take one or more of the types of leave Meadowbrook offers, if they are eligible. Meadowbrook provides for disability, personal, or Family and Medical Leave Act (FMLA) leaves if the employee has

worked there for more than one year. Pregnant employees who are permitted to work without restrictions continue working at Meadowbrook as scheduled throughout their pregnancies.[1] Soppi identified seven other pregnant employees in her declaration who were not restricted by doctor's notes during their pregnancies and worked during those pregnancies until they decided to take some form of leave.

Cadenas visited her physician, Dr. Dawn Collier, on or around May 7, 2012. Collier wrote a letter dated May 7, 2012, stating that Cadenas was 14 weeks pregnant, that she had an estimated delivery date of November 4, 2012, and that activity was restricted as follows: "no lifting, pushing, pulling over 20 lbs." Cadenas delivered the letter to Soppi either on, or in the days after May 7, 2012,[2] and first learned of Meadowbrook's light duty policy at that time. Soppi testified that she considered this letter to be a voluntary resignation, even though Cadenas did not write the letter herself or say anything about leaving her job. Nevertheless, Cadenas continued to work until at least May 13, 2012, although the parties dispute whether Soppi was aware of this, and she was also scheduled to work on May 15, 2012.[3] (It is disputed whether Cadenas' absence from work for a doctor's appointment on that date was excused, but

---

[1] Cadenas' surprising admission of this fact detracts substantially from the weight of the circumstantial evidence that she was fired because of her pregnancy, not her medical restrictions; she does herself no favors by admitting this broadly worded statement by the defendant. Nevertheless, the defendant's treatment of other pregnant employees is probative, but not dispositive, as to its treatment of Cadenas in this instance.

[2] Cadenas asserts that she delivered the first letter to Soppi on May 7, 2012. Pl. Ex. A Cadenas Excerpt Dep. 8:13–17. Meadowbrook asserts it was at some point in the days following that date and cites Soppi's testimony that she does not remember exactly when she received it. Soppi Dep. 18:16–18.

[3] Cadenas states that Soppi knew that Cadenas continued to work after Soppi received this first letter, citing to the subsequent voicemail; the personnel change of status form dated May 17, 2012; and a timecard report stating that Cadenas worked until May 13. Meadowbrook argues that these sources do not support the statement that Soppi was aware that Cadenas continued to work, and cites to Soppi's testimony that Cadenas was taken off the schedule after she received the letter.

Meadowbrook does not contend that this absence was the reason for termination, so the dispute is not material).

Despite the her testimony that she considered the first letter a resignation, Soppi left a voicemail for Cadenas on May 11, 2012, in which she stated that if Cadenas did not provide a note lifting the medical restrictions, the first letter would be considered "a resignation letter because [Meadowbrook doesn't] put people on light duty who are pregnant."

Cadenas returned to her and obtained a second note, which stated that the activity restrictions would not take effect until roughly five weeks later, beginning in the 20th week of her pregnancy. Cadenas returned to work on May 17, 2012, and saw that her name had been removed from the schedule. Cadenas approached Soppi about the issue and gave Soppi the second letter. On May 17, 2012, Cadenas was able to perform all CNA job duties without restrictions.[4] But Soppi told Cadenas that because of the restrictions stated in the second letter, she would not be able to continue working, but that she could return to work after her baby was born. Soppi did not send Cadenas any notice of her termination or resignation. A document titled "Personnel Change of Status" and dated May 17, 2012, listed "Resign" as Cadenas' termination type and also indicated that she was eligible for rehire. The document also stated "cannot work full duty CNA position due to pregnancy with doctor note restrictions." Cadenas did not sign this form, although there is a space provided for the employee's signature. Cadenas had been employed for approximately eight months at the time and so did not qualify for FMLA, disability, or personal leave.

---

[4] Meadowbrook argues that this is immaterial because Cadenas' employment had already ended by May 17, and further asserts that the second doctor's note did not lift *all* restrictions. See Def. Resp. to Pl. Stmt. of Add'l Facts, Dkt. # 29 ¶ 35. However, cited authority for the latter statement does not support it; the note imposed no restrictions until the 20th week of pregnancy. It stated: "Activity is restricted as follows: no lifting, pushing, pulling over 20 lbs *after 20 weeks of gestation*."

Cadenas gave birth on November 3, 2012, and did not request to return to work at Meadowbrook in the months that followed. Soppi wrote Cadenas a letter on December 12, 2012, offering to return Cadenas to her CNA position. Cadenas declined the offer.

## DISCUSSION

Meadowbrook has moved for summary judgment, arguing that Cadenas cannot show that she was terminated because she was pregnant rather than because she could not perform required duties of her job. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court must grant a motion for summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Bio v. Federal Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). When considering a motion for summary judgment, the Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. General Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)).

### A. Pregnancy Discrimination

To succeed on a claim under Title VII of the Civil Rights Act of 1964, a plaintiff "must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action . . . , and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). Title VII prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e–2(a). Congress explicitly extended Title VII protection to pregnant women through the Pregnancy Discrimination Act of 1978 (PDA), which prohibits employment

discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

As with all Title VII claims, plaintiffs may establish a PDA claim through the direct method or the indirect method of proof. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013) (citation omitted). Here, Cadenas argues that she can succeed on either ground. "'Direct' proof includes both evidence explicitly linking an adverse employment action to an employer's discriminatory animus, and circumstantial evidence that would permit the trier of fact to infer that discrimination motivated the adverse action." *Morgan*, 724 F.3d 990, 995 (citations omitted).[5] "If the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even without producing any 'direct' proof." *Morgan*, 724 F.3d 990, 996.

The indirect method, which stems from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires the plaintiff to establish a prima facie case of discrimination by showing that: "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment.'' *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The burden then shifts to the employer to provide a non-discriminatory reason for the adverse employment action. *Morgan* at 996. "If the

---

[5] Circumstantial evidence used for this method may include: ''(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action.'' *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir.2011).

6

employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination." *Id.*

Cadenas fails to meet her burden under the indirect method of proof. She argues that she can point to similarly situated, non-pregnant employees who were treated more favorably than she because none of the other non-pregnant CNAs at Meadowbrook were terminated based on "the mere possibility of future work restrictions."[6] However, Cadenas' future work restrictions as set out in the second letter from her doctor were not just possible or hypothetical, but actual. She is not, therefore, similarly situated to any fellow CNA who had only a "mere possibility" of future restrictions. Cadenas presents no evidence that the five non-pregnant CNAs to whom she refers in her affidavit had informed Meadowbrook that they had similarly definite limiting medical restrictions caused by a non-work-related injury, and yet they were permitted to remain employed working on light duty.

Turning to the direct method of proof, Cadenas argues that the timing of her discharge, the date of the personnel change form, and inconsistent statements from Soppi create a convincing mosaic of circumstantial evidence that would allow a reasonable juror to infer intentional discrimination based upon her pregnancy. The core question is whether Cadenas has sufficient evidence from which it can be inferred that pregnancy was a "motivating factor" in her discharge. *See Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir. 2011).

As an orienting principle, it is clear that Meadowbrook was not required to accommodate Cadenas' physical restrictions—if it would not have accommodated a non-pregnant employee's

---

[6] Cadenas states in her declaration that four Meadowbrook employees—Yesenia Alvarez, Ronet Mondee, Wendy Horan, and Esmerald Ortega—were non-pregnant, female employees who did not suffer an adverse employment action on May 12, 2012. Cadenas Decl. ¶ 25. She also states that a male CNA at Meadowbrook, Kenneth Reyes, did not suffer an adverse employment action on May 17, 2012, because of the possibility of future work restrictions. *Id.* at ¶ 26.

7

similar restrictions—or give her any special treatment, such as light duty, if it would not have afforded that option to a non-pregnant employee. *See Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 549 (7th Cir. 2011). Here, there no evidence that Meadowbrook applied its light duty policy inconsistently to pregnant and non-pregnant employees. Cadenas submits no competent evidence to contradict the fact that Meadowbrook denied both pregnant and non-pregnant employees an accommodation of light duty work unless they had suffered a work-related injury. This neutral policy is not evidence of discrimination. *Serednyj,* 656 F.3d at 548. Absent any duty to accommodate, it follows that Meadowbrook is entitled to terminate an employee because she cannot perform the basic functions of the job, even if the reason for that restriction is pregnancy. As the Seventh Circuit stated in *Troupe v. May Department Stores*, 20 F.3d 734, 738 (7th Cir. 1994): "If an employee who does not have an employment contract cannot work because of illness, nothing in Title VII requires the employer to keep the employee on the payroll." Thus, in that case, although the pregnant worker's tardiness was caused by doctor-verified symptoms of her pregnancy, the employer was entitled to fire her.

In light of these principles, to the extent that Cadenas' pregnancy-related restrictions would prevent her from performing the normal duties of a CNA—a fact that is not disputed—Meadowbrook was entitled to terminate her employment. At a minimum, therefore, Meadowbrook was entitled to fire Cadenas as of the 20th week of her pregnancy when, it is undisputed, she would no longer be able to do her job effectively.

The narrow question in this case is, therefore, whether Meadowbrook was entitled to fire Cadenas in her 15th week of pregnancy, when—if the facts are viewed in her favor—she was not subject to any medical restrictions. This assumes that, contrary to Soppi's testimony, Cadenas was not considered to have "resigned" or to have been terminated immediately upon submission

8

of the first doctor's note (which did not limit the restrictions to the 20th week of pregnancy and beyond). There are some disputed facts regarding the effect of the first note, but for present purposes the facts are taken in plaintiff's favor, on this and any other disputed questions. And no matter what was said about the first letter being a "resignation," it is clear that Cadenas continued working for days after she presented the first note to Meadowbrook; that on May 11, Soppi specifically invited her to present a second doctor's note revising the restrictions, and she did so; and that Meadowbrook's paperwork lists a separation date of May 17—after the date listed on the second note.

So, the question remains whether as a matter of law Meadowbrook could terminate Cadenas at 15 weeks of pregnancy before the restrictions took effect. The Seventh Circuit has discussed the concept of "anticipatory" termination in the pregnancy context. Two cases are particularly relevant: *Maldonado v. U.S. Bank*, 186 F.3d 759 (7th Cir. 1999), and *Marshall v. American Hosp. Ass'n*, 157 F.3d 520 (7th Cir. 1998). In *Marshall*, the Seventh Circuit upheld summary judgment for an employer who terminated a pregnant employee who, at the same time that she disclosed her pregnancy also informed her employer that she was planning on being absent from work for two months during the busiest part of the year, including the organization's annual conference. *See* 157 F.3d at 526. And in *Maldonado*, the Seventh Circuit reversed the grant of summary judgment for an employer who fired a pregnant bank teller trainee on the assumption that she would be absent during a crucial period. The employee had not stated that she would be taking any time off, and the employer lacked an evidentiary basis for assuming that the pregnancy would disrupt its future staffing needs. *See* 186 F.3d at 766-67. As relevant here, though, the Court specifically allowed for "some limited circumstances" in which an employer would possess sufficiently concrete evidence of future limitations such that an anticipatory

termination would be justified by the employer's legitimate, non-discriminatory staffing needs. *Id.* at 767. Similarly, in *Marshall*, where it was clear that the employee would in fact be absent during a crucial period, the employer was entitled to terminate her without waiting until she was actually unavailable.

Thus the argument can be made—and Meadowbrook finally gets around to making it in its reply brief, particularly in Footnote 4—that this is a case where an anticipatory termination is justified because the prospective limitations on Cadenas were not speculative. Certainly, the type of evidence that is of record here—a doctor's note effectively stating that after 20 weeks of pregnancy, Cadenas could not perform vital CNA duties—is sufficient to pass muster under *Marshall* and *Maldonado*. Cadenas argues that, as the Seventh Circuit stated in *Maldonado*, "an employer cannot discriminate against a pregnant employee simply because it believes pregnancy *might* prevent the employee from doing her job." 186 F.3d at 759. But the pregnancy-related restrictions in this case were not merely possible, but actual; the second letter from Cadenas' doctor stated that the restrictions would be in place after she reached the 20th week of pregnancy.

Nevertheless, summary judgment is not warranted on that basis. In both *Marshall* and *Maldonado*, there was a reason for firing the employee before the pregnancy-related restrictions or absences were realized. In *Maldonado*, one of the employer's specific needs for its part-time bank tellers was the ability to substitute for full-time tellers during the summer months when vacations were frequent; if the plaintiff, who was still in training, would not be able to serve that function, there was no point to hiring her. (Of course, in that case, the Court ruled that termination was nevertheless inappropriate because it was merely speculation that the teller would be unavailable.) The Seventh Circuit stated that the PDA does not "handcuff employers

10

by forcing them to wait until an employee's pregnancy causes a special economic disadvantage." *Maldonado*, 186 F.3d at 767. In *Marshall*, the pregnant employee planned an eight-week leave during the run-up to a crucial conference, the organization of which was one of her primary job duties. The employer was entitled to fire her months in advance so that her position would be filled in time for the new employee to prepare for the event.

By contrast, in this case, Meadowbrook never suggested, or provided evidence, that there was any business reason not to let Cadenas work during the five weeks remaining before her restrictions went into effect. There is no evidence that Cadenas' restrictions were to take effect during a particularly critical time for Meadowbrook. If anything, it seems that terminating Cadenas while she was still capable of performing her job duties would have left Meadowbrook short-staffed sooner than was necessary, whereas in *Marshall* the employer needed to replace the pregnant employee quickly in order to continue preparations for its busiest time of year. Without any physical restrictions applicable between weeks 15 and 20 of Cadenas' pregnancy, Meadowbrook has pointed to no non-discriminatory reason for terminating Cadenas effective immediately. Drawing fact inferences in her favor, Cadenas told Meadowbrook that she was pregnant and, five weeks hence, would be unable to perform her full duties; Meadowbrook fired her immediately. On these facts, a reasonable jury could conclude Meadowbrook terminated Cadenas because of her pregnancy, not because she was subject to any present restrictions. The circumstantial evidence that permits this inference of discrimination includes the timing of the discharge, the absence of any nondiscriminatory reason, such as Cadenas' job performance, for firing her in her 15th week of pregnancy, the inconsistency of the May 17 personnel form with

the doctor's note, and Soppi's statements to the effect that Cadenas could not work because of her pregnancy.[7]

As noted above, there is some evidence that Meadowbrook considered Cadenas terminated or resigned upon its receipt of her first doctor's note, which did not put any time limits on the physical restrictions. If this were undisputed, Meadowbrook would likely prevail on its defense that Cadenas could not perform her normal duties, and no light duty was available. But the import of the first note is very much in dispute where, on May 11, Meadowbrook offered Cadenas the opportunity to submit a revised note, and she did so; where Cadenas worked for days after submitting the first note; and where the date on which Cadenas says she gave Soppi the second letter, May 17, 2012, was the same as that of the personnel change form listing her status as "Resign." On summary judgment, the Court cannot resolve this fact dispute, and certainly not in the defendant's favor.

Therefore, even though an anticipatory discharge may be appropriate in some cases, Meadowbrook has not established based on the summary judgment record that this is such a case. Cadenas was fully able to work until her 20th week of pregnancy, and, therefore, a jury could reasonably conclude that she was terminated in her 15th week for a reason other than physical limitations—namely, discrimination based upon her pregnancy.

### B. Claim for Violation of the Illinois Record Review Act, 820 ILCS 40/2

Cadenas also alleged in her complaint that Meadowbrook violated the Illinois Record Review Act, 820 ILCS 40/2, by failing to provide her with her personnel file or to timely request an extension of time to do so. Meadowbrook seeks summary judgment based on the plaintiff's

---

[7] As previously noted, *see* fn. 1, *supra,* Cadenas' admission that Meadowbrook usually allows pregnant employees without medical restrictions to work indefinitely detracts from the weight of the circumstantial evidence that she was terminated because of pregnancy and significantly weakens her case; however, it will be left to a jury to weigh the evidence.

failure to exhaust administrative remedies and her subsequent receipt of the file. Cadenas admits that she did not file a claim with the Illinois Department of Labor, and also concedes in her response to Meadowbrook's statement of material facts that she did eventually receive her personnel file. Cadenas voluntarily withdrew this claim in the conclusion of her response brief, *see* Dkt. # 27 at 12, and therefore no further discussion is warranted.

* * *

For these reasons, Meadowbrook's motion for summary judgment is denied as to the discrimination claim.

Date: July 15, 2014

John J. Tharp, Jr.
United States District Judge